**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**AT CINCINNATI**
**CIVIL ACTION NO. 13-252-SJD-JGW**

**KATHRYN ZABELL**                                          **PLAINTIFF**

**V.**

**MEDPACE, INC.**                                          **DEFENDANT**

**REPORT AND RECOMMENDATION**

Pending is a motion for summary judgment filed by Defendant Medpace, Inc.

("Medpace"). Doc. 24. After considering the record and applicable law, the Court recommends

the motion be granted in part and denied in part.[1]

### I. Factual and Procedural History[2]

Medpace is a contract research organization which employs medical writers, whose job is

to gather information and construct documents for Medpace's sponsors (clients). Medpace

designates its medical writers by levels, with each ascending level expected to work more

---

[1] The parties have submitted voluminous briefs and exhibits, which the Court has reviewed. However, this report and recommendation focuses only on the arguments and authorities which are most dispositive and, accordingly, does not specifically address each of the plethora of arguments and citations mentioned by the parties.

[2] To the extent possible, the facts in this report and recommendation are in alignment with the parties' statements of undisputed facts. *See* Docs. 24-1; 29-1. Disputed facts are generally noted as such. Of course, the familiar standard of review for motions for summary judgment requires the Court ultimately to review the facts in the light most favorable to plaintiff, the nonmoving party. *See, e.g., Keweenaw Bay Indian Comm. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) (holding that when ruling on a motion for summary judgment the court "must view the facts and any inferences that can be drawn from those facts . . . in the light most favorable to the nonmoving party.") (quotation marks omitted).

independently and to have a greater workload.[3]  Medpace hired plaintiff Kathryn Zabell as a medical writer II in November 2010, which was plaintiff's first full-time job since obtaining her PhD in biology in 2007.

Plaintiff's first writing projects at Medpace were two protocols, fifty to one hundred page documents describing how clinical studies are to be conducted.  The parties disagree about whether plaintiff's performance in creating those protocols, as well as subsequent assignments, was poor.  Medpace contends plaintiff failed to maintain consistency in her document writing and struggled to incorporate suggested changes; plaintiff concedes her work needed some editing but contends her boss, Dennis Breen, was generally complimentary of her work on those early projects.  Plaintiff testified that she did not recall whether she missed some edits suggested by a doctor with whom she was working on a project but acknowledges that she was "human" and "things happen." Plaintiff also admitted that Breen became upset by plaintiff's draft of a "Q" protocol, and that one reviewer found sentence structure issues in that draft.[4]

Plaintiff also agrees that Medpace asked for an additional day from a sponsor to complete a "KB" protocol on which plaintiff was working due to awkward language in the draft protocol. Plaintiff also admits that she received an angry voice mail and email from a doctor with whom she was working on that protocol, stemming from plaintiff not incorporating the doctor's suggested changes.  However, plaintiff contends that the KB protocol was her first assignment and the sponsor later sent her an email thanking her for sending a good draft.  Moreover, plaintiff

[3] Despite the policy of progressive responsibilities, plaintiff states that in practice she did not notice a difference between a medical writer I and a medical writer II.

[4] The identities of defendant's sponsors have been designated confidential and, thus the Court will refer to the protocols by using the pseudonyms found in the parties' briefs.

points to Breen's deposition testimony that he thought the doctor's angry remarks to plaintiff were too harsh.

In March 2011, plaintiff sent an email to a doctor in which plaintiff expressed self-doubt as to her ability to do her job.  Plaintiff, however, received a reassuring email from the doctor in which the doctor stated that the protocol at issue was "doubly" tough.  Plaintiff did not discuss her later concerns about how she was treated by Breen with the doctor.

In spring 2011, plaintiff was first assigned to draft clinical study reports ("CSR"), which are documents explaining how a study was conducted and a summarization of the study's results. All parties acknowledge that Breen and senior medical writer Katey Cafferkey assisted plaintiff in writing CSRs, though the level of Breen and Cafferkey's involvement is disputed.

Plaintiff was assaulted in her apartment in June 2011.  Breen was supportive and professional toward plaintiff in the immediate aftermath of the assault and Breen permitted plaintiff to miss time from work as needed, including taking time off to attend doctor and therapist sessions in Indianapolis.[5]

In July 2011, plaintiff learned her assailant was HIV positive.[6]  Plaintiff informed Breen of her exposure to HIV and Breen granted plaintiff's request to go home to be with her family. When she returned to work, things seemed normal at first.  The crux of the case lies in the

---

[5] When hired by defendant, plaintiff and her family resided in Indianapolis.  Plaintiff then obtained an apartment in the Cincinnati area and commuted to Indianapolis, where her husband and children continued to reside, on weekends and other occasions.

[6] After a year of tests, plaintiff learned she is not HIV positive.

parties' dispute as to what happened in the ensuing weeks and months.  Plaintiff contends that

after Breen learned of her HIV exposure he:

> ceased casual conversation and he never again asked her about moving to
> Cincinnati. His body language also changed. He was uncomfortable and leaned
> away from her when she was in his presence, especially in his office. He tried to
> physically avoid her. One morning Zabell went into his office to speak to him and
> he jumped out of his chair, shouted something about having a meeting, and ran
> out the door. Breen cleared his desk when he knew that Zabell was coming into
> his office, and he watched everything she touched. Additionally, after he learned
> about her exposure to HIV, Breen asked Zabell if she wanted to move her desk
> away from the other employees.

Doc. 29-1, p. 7.  Plaintiff thus contends defendant regarded her as suffering from an impairment,

being HIV positive/having been exposed to HIV.[7]

Defendant contends plaintiff's performance continued to be insufficient after the assault,

the end result of which was that Cafferkey and Breen had to expend a great deal of time on

plaintiff's projects.  However, plaintiff points to the time logs kept by Cafferkey and Breen to

show that they were not spending an inordinate amount of time on her (plaintiff's) projects.

Cafferkey testified that she told Breen that plaintiff's work was not progressing and she

(Cafferkey) could not continue to do both her job and plaintiff's.

Breen terminated plaintiff's employment in October 2011.  Breen, and defendant,

contend the termination was due to plaintiff's poor job performance.  Plaintiff contends the

termination was due to Breen (i.e., defendant) having regarding her as being disabled.

---

[7] Plaintiff testified that she did not tell Breen of her HIV test results; Breen testified that plaintiff told him she was
HIV positive.  In his deposition, Breen denied that he regarded plaintiff as being disabled.  It is undisputed that
plaintiff told Cafferkey in August 2011 that she (plaintiff) was not HIV positive.  There is no indication that
Cafferkey discussed plaintiff's HIV status with Breen or any other Medpace employee.

Plaintiff filed this action in April 2013.  Doc. 1.  Plaintiff raises three causes of action:  1) defendant discriminated against her under the Americans With Disabilities Act ("ADA") due to defendant regarding plaintiff as being disabled (*see* 42 U.S.C. § 12112*;* 2) disability discrimination under Ohio Rev. Code § 4112.02; and 3) ERISA interference (*see* 29 U.S.C. § 1140).  Defendant filed the pending motion for summary judgment in April 2014.[8]  Doc. 24. Additional facts will be discussed as necessary.

## II.  Analysis

### A.  Summary Judgment Standard of Review

Summary judgment is proper only if the facts on file with the court demonstrate that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party may discharge its burden by "pointing out . . . an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party cannot rest on its pleadings, but must identify specific facts that remain in dispute for the finder of fact at trial.  *See id.* at 324.  Although all inferences are drawn in favor of the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986), the nonmoving party must present significant and probative evidence in support of its complaint.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  "Conclusory assertions, supported only by Plaintiff's own opinions, cannot

---

[8] In August 2014, the case was reassigned to Senior Judge Spiegel for the limited purpose of ruling on the motion for summary judgment.  Doc. 43.  In January 2015, the case was reassigned to Chief Judge Dlott.  Doc. 44.  Chief Judge Dlott issued an order referring the motion for summary judgment to this judge for preparation of a report and recommendation thereafter.  *See* Doc. 45.

withstand a motion for summary judgment." *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).

The court's function is not to weigh the evidence and determine the truth of the matters asserted, but to determine whether a genuine issue of material fact remains for a fact finder at trial. *Anderson*, 477 U.S. at 249. The key inquiry is whether the evidence presents a "sufficient disagreement to require submission [of the case] to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404-05.

## B. ERISA Interference

Plaintiff has indicated she does not oppose the Court granting summary judgment to defendant on her ERISA interference claim. *See* Doc. 29, p. 1 ("Plaintiff does not oppose Medpace's Motion as to Count III—ERISA interference."). Accordingly, the Court should do so.

## C. ADA/State Law Discrimination Claims[9]

### 1. Standard of Review

---

[9] "Ohio's disability-discrimination statute and the ADA employ the same analysis . . . ." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007).

6

A plaintiff may establish a prima facie ADA case via direct or circumstantial evidence. *See, e.g., Yarberry v. Gregg Applicances, Inc.*, 2014 WL 1382154, at *5 (S.D. Ohio April 8, 2014) (report and recommendation adopted at 2014 WL 4639149 (S.D. Ohio Sept. 16, 2014)). Because plaintiff does not have direct evidence of discrimination, the Court must utilize the burden shifting rubric for circumstantial (i.e., indirect) evidence claims.

"Under the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Greene*, 411 U.S. 792 (1973)], the plaintiff must first establish a prima facie case under the relevant statute. A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Yarberry*, 2014 WL 1382154 at *6 (quotation marks and citations omitted).  To make her prima facie case, plaintiff must:

> show that 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.  Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision. If the defendant makes the appropriate showing, the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reason was a pretext for discrimination.

*Id.* (quotation marks and citations omitted).[10]  "Ultimately, plaintiff must demonstrate that 'but for' [her] disability, [s]he would not have been terminated from [her] position . . . . Thus, plaintiff must show that but for [her] disclosing to defendant that [s]he had [been exposed to HIV] [s]he would not have been terminated."  *Crane v. Monterey Mushroom, Inc.*, 910 F.Supp.2d 1032, 1045 (E.D. Tenn. 2012) (citing *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012)).

---

[10] There is no dispute that plaintiff suffered an adverse employment action.

7

### 2. Prima Facie Case

### a. Regarded as Being Disabled[11]

Plaintiff does not have an actual disability; therefore, to make her prima facie case she must show that defendant regarded her as being disabled.  *See* 42 U.S.C. §12102(1) (providing in relevant part that a person is disabled if she is "regarded as having" a disability).  Defendant contends plaintiff has not shown that it regarded her as being disabled because Breen (though he mistakenly thought plaintiff was HIV positive) testified that he did not regard plaintiff as being disabled and no other person involved in the decision to terminate plaintiff believed plaintiff to be disabled.

In response, plaintiff minimizes Breen's testimony regarding his subjective beliefs by stressing that a person can be deemed regarded as being disabled "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. §12102(3)(A).  Indeed, the Sixth Circuit has held that the regarded as disabled statutory language "protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (quotation marks and citations omitted).  When a plaintiff proceeds under a regarded as disabled theory a court "must look to the state of mind of the employer against whom he makes a claim.  Under the 'regarded as' prong of the ADA, membership in the protected class becomes a question of intent. And . . . that question—*i.e.*, the employer's motive—is one rarely susceptible to resolution at the summary

---

[11] As this is a "regarded as disabled" case, the first and fourth prongs essentially merge as it would be illogical for defendant to unknowingly regard plaintiff as being disabled.

judgment stage." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001) (quotation marks omitted).[12]

Breen believed plaintiff to be HIV positive and, fairly shortly afterwards, decided to terminate her employment.  Though defendant disputes it, plaintiff also testified that Breen began to treat her differently after she had been attacked (specifically, after Breen believed plaintiff became HIV positive).  For example, plaintiff testified that Breen was markedly more critical of her work and fled from his office on one occasion to avoid meeting with plaintiff.  In addition, the United States Supreme Court has concluded that, for ADA purposes, "HIV infection satisfies the statutory and regulatory definition of a physical impairment during every stage of the disease." *Bragdon v. Abbott*, 524 U.S. 624, 637 (1998).  Therefore, the fact that plaintiff was asymptomatic and requested no accommodation is, defendant's argument to the contrary notwithstanding, not determinative as to whether plaintiff has made a prima facie case.[13] Accordingly, bearing in mind the minimal burden imposed upon a plaintiff in making a prima facie case, as well as the fact that discrimination cases in which an employer's intent is at issue may only "rarely" be resolved via summary judgment, the Court concludes that plaintiff has made a prima facie showing that defendant regarded her as being disabled (i.e., plaintiff has satisfied prongs one and four).

---

[12] Though it is only rarely appropriate, "summary judgment is not foreclosed simply because a case involves such issues." *Laws v. HealthSouth Northern Kentucky Rehabilitation Hosp. Ltd. Partnership*, 828 F.Supp. 2d 889, 906 (E.D.Ky. 2011).

[13] The Court is aware that, since *Bragdon* was issued, advances in medicine and pharmacology have enabled persons who are HIV positive to live longer, fuller lives.  Those beneficial developments, however, do not permit this Court to ignore or circumvent the remarkably straightforward holding in *Bragdon* that HIV is a disability "at every stage of the disease."  524 U.S. at 637.

**b. Otherwise Qualified for the Position**

Turning to prong two, defendant asserts plaintiff was not otherwise qualified for her position because her job performance was poor (i.e., she was not meeting defendant's legitimate expectations). *See, e.g., Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) ("there are also disputed factual issues with respect to whether Vincent was qualified for her position. To establish this element, a plaintiff must show that her performance met her employer's legitimate expectations at the time of her discharge.").[14] Plaintiff, of course, disputes that her job performance was poor and states defendant's reliance on that proffered reason is a post hoc rationalization for its discriminatory acts (i.e., a pretext). The Sixth Circuit has held that "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000).[15]

Plaintiff possessed a PhD and was facially qualified for her position, as made plain by her having been hired by defendant less than a year before her termination. In addition, though defendant disputes that the score actually denotes satisfactory work (an argument that will be explored in more detail later herein), plaintiff's 2011 cumulative mid-year evaluation score[16] was 3.18 on a 1-4 scale, with 3 purporting to mean an employee's performance was meeting

---

[14] *Vincent* is not an ADA case but its logic applies equally to the prima facie requirements of ADA claims.

[15] *Cline* is a pregnancy discrimination case but its holding has been used in ADA cases. *See, e.g., Macy v. Hopkins County School Bd. Of Educ.*, 484 F.3d 357, 366 (6th Cir. 2007) (quoting *Cline* standard), abrogated on other grounds by *Lewis*, 681 F.3d 312.

[16] Plaintiff testified that the evaluation was performed in May 2011, prior to her having been assaulted, but she did not discuss the evaluation with Breen until after the assault. Plaintiff's Depo. (doc. 20), p. 184-85.

defendant's expectations.[17]  *See* Doc. 22-1, p. 29-31.  In addition, though there are contrasting emails critical of plaintiff's performance, plaintiff has pointed to at least some emails she received which were complimentary of her work.  *See* Doc. 32, p. 6-7.  Therefore, the Court concludes that plaintiff has made a prima facie showing that she was qualified for the position.

### c.  Treated Differently Than Similarly Situated Employees

Finally, defendant's argument to the contrary notwithstanding, plaintiff is not absolutely required to show that she was replaced by someone outside her protected class.  *See, e.g., Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1185, n. 11 (6th Cir. 1996) ("We do not believe that the plaintiff need necessarily establish that he or she was replaced by a person outside the protected class as an element of his or her prima facie case."), abrogated on other grounds by *Lewis*, 681 F.3d 312.  Instead, "the precise characterization of the fifth prong of the test will sometimes vary depending upon the factual scenario confronting the court." *Monette*, 90 F.3d at 1185, n. 11.  Accordingly, a plaintiff may meet the final prima facie prong by showing she "was treated differently than similarly-situated employees."  *Sutherland v. City of Cincinnati*, 2014 WL 1685900, at *6 (S.D. Ohio April 29, 2014) (citing *Jones v. Potter*, 488 F.3d 397, 403-406 (6th Cir. 2007)).  Temporal proximity may be taken into account to show disparate treatment.  As the Sixth Circuit has held, "[w]here an adverse employment action occurs very close in time

---

[17] Breen testified in his deposition that "according to process in terms of a literal description of it" a score of 3 on an evaluation meant that an employee was meeting defendant's expectations.  Breen Depo, doc. 22, p. 127-28.  Breen also testified that a 3 was "more of a neutral score."  *Id.* at 128.  Nonetheless, Breen also testified that a score of 3 was, despite facial appearances, not an indicator that an employee was meeting expectations.  However, Keri Jolly (formerly Marshall), who was employed as a medical writer for defendant concurrently with plaintiff, states in her declaration under oath that a performance review of between three and four meant an employee was "performing above average."  Doc. 29-9, p. 2. Jolly further declares that she was told by her manager that an evaluation score of 3 was "a good score."  *Id.* For purposes of the prima facie case, therefore, plaintiff's cumulative mid-year evaluation score of 3.18 supports her contention that her performance was not markedly subpar.

after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).[18]  Indeed, in a retaliation case the Sixth Circuit has held that termination three months after an employee engaged in protected activity was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [plaintiff's] burden of demonstrating a prima facie case." *Singfield v. Akron Metropolitan Housing Authority*, 389 F.3d 555, 563 (6th Cir. 2004).  However, other cases make plain that a plaintiff may not rely upon timing alone.  *See, e.g., Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010) (holding that "temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim.").

Around three months passed between plaintiff notifying Breen of her HIV exposure and Breen terminating plaintiff's employment. In addition, Kristen Jones, another medical writer who was not disabled or regarded as such, scored lower on her 2011 mid-year evaluation than did plaintiff yet Jones was not terminated until April 2012—months after plaintiff was terminated. In addition, other medical writers scored lower than 3.18 on early evaluations but were not terminated quickly.  Defendant supplies its justification as to why those other employees were not terminated as fast as was plaintiff (primarily that some of the other medical writers did not report directly to Breen).  However, the burden of making a prima facie case is not onerous and plaintiff has shown both temporal proximity from the time she was exposed to HIV (bearing in mind Breen's mistaken belief plaintiff was HIV positive) and has shown that other medical

---

[18] *Mickey* is not an ADA claim, but nothing in its holding suggests that it should not apply to ADA claims.

writers employed by defendant were not terminated shortly after receiving evaluation scores similar to plaintiff's.   The Court concludes, therefore, that plaintiff has presented a prima facie case that she was treated differently than similarly situated employees who were not regarded as being disabled.  Accordingly, the Court should find that plaintiff has satisfied her burden to present a prima facia case.

### 3.  Nondiscriminatory Reason for Plaintiff's Termination

Defendant asserts that its legitimate, nondiscriminatory reason for terminating plaintiff is that her performance was "not to a level expected for [a] Medical Writer II and [was] not improving as expected."  Doc. 24, p. 15.  Plaintiff does not discuss whether defendant has satisfied its burden to present a nondiscriminatory reason for terminating plaintiff.  Moreover, Breen testified in his deposition that, in his opinion, plaintiff's performance was deficient.  Therefore, the Court concludes that defendant has presented a legitimate, nondiscriminatory reason for terminating plaintiff, meaning that the analysis shifts to the heart of the parties' dispute: whether plaintiff can show that proffered reason is pretextual to a degree sufficient to defeat defendant's motion for summary judgment.

### 4.  A Genuine Issue of Material Fact Exists as to Whether Defendant's Proffered Rationale Is Pretextual

"In order to demonstrate pretext, a plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation."  *Crane*, 910 F.Supp.2d at 1049 (quotation marks and citation omitted).  More specifically,

With regard to pretext, the Sixth Circuit has stated:

13

> To raise a genuine issue of material fact on the validity of an
> employer's explanation for an adverse job action, the plaintiff must
> show, again by a preponderance of the evidence, either (1) that the
> proffered reasons had no basis in fact; (2) that the proffered
> reasons did not actually motivate the action; or (3) that they were
> insufficient to motivate the action.

> *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 883 (6th Cir.1996) (citations
> omitted). "Pretext is a commonsense inquiry: did the employer [take the adverse
> employment action against] the employee for the stated reason or not? This
> requires a court to ask whether the plaintiff has produced evidence that casts
> doubt on the employer's explanation, and, if so how strong it is." *Chen v. Dow
> Chem. Co.,* 580 F.3d 394, 400 n. 4 (6th Cir.2009). "As the Supreme Court has
> made clear, [the plaintiff] was required to provide not only evidence from which
> the finder of fact could conclude that [defendant's] proffered reason is false, but
> also evidence from which the factfinder could conclude that [defendant's] action
> was intentionally discriminatory." *Smith v. Allstate Ins. Co.,* 195 Fed.Appx. 389,
> 395 (6th Cir.2006) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113
> S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("It is not enough, in other words, to *dis*
> believe the employer; the factfinder must *believe* the plaintiff's explanation of
> intentional discrimination.")). At all times, the ultimate burden of persuasion
> remains with the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248,
> 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Crane*, 910 F.Supp. 2d at 1049.  However, "[t]o survive a motion for summary judgment, the

plaintiff need not *prove* that the defendant's proffered rationale is pretextual, as that would be

enough proof for summary judgment in favor of the plaintiff. Rather, the plaintiff must prove

only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield v.

Tennessee*, 639 F.3d 253, 260 (6th Cir. 2011).  "[T]he correct standard . . . is whether [plaintiff]

ha[s] created a genuine issue of material fact as to *both* her *prima facie* case *and* pretext."  *Id.*

   To support her argument that defendant's proffered reason is pretextual, plaintiff first

relies on the temporal proximity—roughly three months--between her exposure to HIV (and

Breen's belief she was HIV positive) and her dismissal.  Though temporal proximity standing

alone cannot demonstrate pretext, "suspicious timing is a strong indicator of pretext when

accompanied by some other, independent evidence." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012) (quotation marks and citation omitted).[19]

The Sixth Circuit has held that an employer's changing rationale for having undertaken an adverse employment action against a plaintiff is "suspicious" and "is evidence of pretext." *Asmo v. Keane, Inc.*, 471 F.3d 588, 596 (6th Cir. 2007) (pregnancy discrimination case). *See also Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (holding in an age discrimination case that "[s]hifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, Cicero shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination.").[20]  To show pretext, plaintiff points to the fact that in this Court defendant has not relied upon some of the reasons it gave the EEOC to support plaintiff's termination.

For example, defendant told the EEOC that Breen had been told by other employees, including Keri Marshall (Jolly) that plaintiff spent too much time chatting with them regarding non-work matters. Doc. 22-1, p. 45-46.  In a supplementary statement, defendant specifically relied upon Jolly, among others, having asked Breen to move her cubicle away from plaintiff due to plaintiff's "chatty and disruptive behavior." *Id.* at 48.  In its summary judgment motion, defendant did not raise plaintiff's allegedly disruptive chattiness as a reason for her termination.

---

[19] Though it is not an ADA case, *Seeger*'s holding is applicable logically to the case at hand.

[20] The "shifting justifications" method of showing pretext has been used in ADA cases.  See, e.g., *Saley v. Caney Fork, LLC*, 886 F.Supp.2d 837, 857-58 (M.D. Tenn. 2012).

Indeed, Jolly states under oath in her declaration that plaintiff "was not disruptive" and she (Jolly) "did not ask to change cubicles because of [plaintiff]."  Doc. 29-9, p. 2.

Before the EEOC, defendant also asserted that plaintiff worked a "sporadic schedule" due to her trips to Indianapolis, and that schedule became "quite disruptive" to Breen's department.  Doc. 22-1, p. 45.  Defendant did not allege in its summary judgment motion that plaintiff's schedule was "sporadic" or "quite disruptive."  In fact, in his deposition Breen first definitively testified that plaintiff's trips to and from Indianapolis were not a problem,[21] but when reminded of the specifics of defendant's statement to the EEOC Breen testified vaguely that plaintiff's schedule may have been disruptive.[22]

Defendant contends its overarching position has remained consistent:  plaintiff was terminated for poor performance.  Therefore, according to defendant, it has not abandoned the rationale it presented to the EEOC.  However, as previously noted, although its bottom line position has basically remained consistent, defendant raised several supporting reasons for its

---

[21] For example, when asked "are you saying that her [plaintiff's] appointments did not interfere with the work?" Breen responded "[t]hat's correct."  Doc. 22 (Breen depo.) p. 166.  Shortly thereafter, Breen was asked "[y]ou never formed the opinion that she [plaintiff] was missing too much time?"  *Id.*  Breen responded simply "[n]o, I did not."  *Id.*  Later, Breen was asked again if, before the assault, plaintiff's pattern of leaving work early on Friday afternoons and taking work home with her was a problem.  Breen responded unambiguously:  "[n]o, it was never a problem."  *Id.* at p. 171.

[22] When asked specifically about the truth of the allegations in defendant's EEOC statement that plaintiff's "sporadic" work schedule was disruptive, Breen answered ambiguously that "[a]t times, it, it was disruptive in terms of, for instance, if she's [proofreading] a document for another medical writer and they were relying on that [proofreading] at that point in time, it does disrupt the workflow to have, have that [proofreading] postponed or, you know, sent, send via e-mail during the weekend for that writer to accomplish that work. So it can be disruptive."  Doc. 22 (Breen depo) at p. 209.  When asked if he had any "specific recollection" of plaintiff's work schedule being disruptive, Breen responded only "[o]ther than it being generally at times disruptive to being able to get done [proofreading] work, I don't have a specific document in mind. But I know that at times, you know, in terms of disruption to the work at hand, for other medical writers' projects, at times it was disruptive."  *Id.* at 210.

conclusion to the EEOC that it did not raise in its motion for summary judgment.  Bearing in

mind the proper standard of review for a motion for summary judgment and, consequently,

construing the evidence in plaintiff's favor, the discrepancy between defendant's statements to

the EEOC and its motion for summary judgment supports plaintiff.

Plaintiff finally attempts to show pretext in the purported lack of supporting written

documentation demonstrating that her job performance was poor.  *See, e.g., Gaglioti v. Levin

Group, Inc.*, 508 Fed.Appx. 476, 482 (6th Cir. 2012) (discussing pretext regarding an age

discrimination case and holding that "it is undisputed that there is no documentary evidence,

such as a personal record or evaluation, that substantiates that Gaglioti's performance was

deficient. This buttresses the possibility that poor performance was a post hoc creation by Levin

Group.").  Plaintiff accurately notes that there are three main categories of evidence in this case:

plaintiff's testimony; testimony of defendant's employees (Breen and Cafferkey, primarily) and

the written documentation accumulated during plaintiff's employment with defendant.  As has

been previously discussed, the testimony of plaintiff and defendant's employees is conflicting on

many issues.  As to the third type of evidence--sufficient written documentation of plaintiff's

alleged poor performance--plaintiff asserts:

> Medpace has produced over 80 *thousand* documents in this case, but only *one*
> indicates that Zabell generally failed to meet expectations—and that was an email
> Breen drafted on October 21, 2011, *after* he had decided to terminate her.
> Medpace has not produced any negative reviews, performance improvement
> plans, or documentation discussing any of Zabell's alleged performance issues.
> Instead, Medpace has offered disputed testimony and a few isolated emails
> concerning events six months or more *before* her termination. Medpace can
> identify no documentary evidence to support its position.

Doc. 29, p. 13 (citation omitted).

Plaintiff overstates the matter by arguing that there is only one document in the record which reflects negatively on her job performance. As previously discussed, defendant has produced emails which were critical of plaintiff's work product in various regards (leaving out information, awkward sentence structure, failure to incorporate suggested edits and similar types of complaints). *See* Doc. 24, p. 2-4. In fact, defendant has provided a March 2011 email plaintiff wrote to a doctor in which plaintiff questions her own ability to perform properly her job duties.[23] Plaintiff is correct, however, in that there are at least some other emails in the record which are complimentary of plaintiff's performance,[24] and the emails relied upon by defendant generally date from the early portion of plaintiff's tenure.[25]

Much of the parties' focus regarding documentation of plaintiff's job performance, however, revolves around their differing interpretations of plaintiff's mid-year performance review. In defendant's view, plaintiff's cumulative score of 3.18 reflects poor performance. That viewpoint is supported by the deposition testimony of both Cafferkey and Breen. Specifically, Cafferkey testified:

---

[23] The email stated in relevant part: "Honestly, I'm feeling very uncertain about my ability to do this job. Every time I think I have something figured out I get told I am doing it wrong and should have known better." Doc. 20-1, p. 46.

[24] For example, one March 2011 email thanked plaintiff for doing a "terrific job in pulling all of the protocol together." Doc. 32, p. 6.

[25] The fact that the emails critical of plaintiff's performance generally date from the earlier portions of her tenure with defendant is significant because Breen testified that "it does take anywhere from a year to year and a half, maybe two years to be a highly proficient[--] to become proficient medical writer." Breen Depo. (doc. 22), p. 57. Accordingly, it is logical that a new medical writer could experience early struggles. For example, Alison Gastright, an experienced medical writer, once told defendant in an email: "I've been here 5 years and I still don't get everything. . . . . It's just one of those jobs, I reckon (or else I am the slowest learner on the face of the planet)." Doc. 32, p. 3.

> The reality at Medpace, and in practice, twos were not viewed very well at all. They were actually a red flag for termination. So particularly for new employees, despite their actual performance, we usually avoided giving out twos, because we didn't want to see them get fired before they had had a chance to fully prove themselves.
>
> So it was not uncommon for most of the scores to be within a three and a four. You know, definitely in the lower threes, even though the employee, it may have signified that they were meeting expectations, the reality was it was actually a signal they were not really where they should be.

Cafferkey Depo. (doc. 21) p. 42-43.  Breen similarly testified that the average medical writer's evaluation score was around 3.4-3.5 and "[i]t was well understood that, that any, any score in the -- in the, I'd say three, the low threes to two point something, is not a very good score."  Breen Depo. (doc. 22) p. 138.[26]

Plaintiff, unsurprisingly, construes her evaluation score differently.  Though Breen testified that he believed plaintiff's 3.18 score to reflect negatively on her performance, plaintiff testified that when they orally discussed the evaluation Breen stated that he was "really impressed at the progress I [plaintiff] was making" and "was really pleased they had hired me and that I more than pulled my own weight on the team."  Plaintiff's Depo. (doc. 20), p. 185.  In addition to his testimony that plaintiff's evaluation score was not really an indicator that she was meeting expectations, Breen contrastingly (and somewhat confusingly) also testified repeatedly that a score of 3 on evaluations was average or neutral.  *See* Breen Depo. (doc. 22) p. 141-148.  Gastright agreed at her deposition that a 3 on an evaluation was an "acceptable score" and, moreover, testified she had never been told that a score of 3 was indicative of poor performance.

---

[26] Breen's testimony that it was generally known that an evaluation score of 3 was indicative of subpar performance is contrasted by the declaration of Jolly, who stated she thought a score of 3 meant an employee was performing above average because she had been told by her supervisor that 3 was "a good score."  Doc. 29-9, p. 2. Breen's "general knowledge" testimony is also contradicted by plaintiff, who testified that she had only a "very vague impression" of how medical writers were scored by their supervisors.  Plaintiff Depo. (doc. 20), p. 189.

Gastright Depo. (doc. 33), p. 37.  Similarly, Jolly stated in her declaration that a score of 3 meant an employee was "meeting expectations" and a score between 3 and 4 "indicated that the employee was performing above average."  Doc. 29-9, p. 2.  There is, therefore, a significant disagreement about whether plaintiff's 3.18 evaluation score is actually indicative of poor performance.  Construing the record in the light most favorable to plaintiff, as the Court must do at this stage of the proceedings, her evaluation score was not indicative of poor performance.

The parties also disagree about whether there are similarly situated non-disabled employees who were treated more favorably than plaintiff.  Plaintiff offers several purported comparators who received similar performance review scores but were not terminated as quickly as was she.  Before the Court examines those proffered comparators, it must address defendant's antecedent argument that most of the proposed comparators are not proper benchmarks because they, unlike plaintiff, were not supervised by Breen.

In a case relied upon by defendant, the Sixth Circuit held that "to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor . . . ."  *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).  However, the Sixth Circuit has clarified that a proper comparator need not necessarily have had the same supervisor as a plaintiff.  *See, e.g., Gibson v. Shelly Co.*, 314 Fed. Appx. 760, 771 (6th Cir. 2008) (holding that despite the language in *Mitchell* "we have never held that an equivalence of supervisors was *required* to establish similarity.").  Instead, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects."  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)

20

(quotation marks and citation omitted).  Accordingly, the fact that some of the proposed comparators may not have been supervised by Breen does not, standing alone, prevent them from being proper comparators.

One comparator relied upon by plaintiff is Kristen Jones.  Jones, a medical writer III, was hired by defendant in May 2010 and received a 3.12 on an evaluation given at the end of 2010—a score lower than plaintiff's.  *See* Doc. 29-15.  Jones was not then terminated.  On her mid-year 2011 review, Jones' score went down to 3.05.  *See* Doc. 29-14.  Jones was not then terminated. In fact, even though her evaluation scores were lower than plaintiff's (and had actually dropped between evaluations), Jones was not terminated until April 2012.  Breen Depo. (doc. 22) p. 228.

Jones was not initially supervised by Breen.  However, Jones was a medical writer employed by defendant who was not considered disabled and was allowed to continue to work for defendant for nearly two years before being terminated--despite having received at least two lower evaluation scores than plaintiff.  The fact that Jones was not supervised by Breen during her entire tenure at defendant may be a factor that a jury could use to infer a lack of discriminatory intent, but for summary judgment purposes the record shows that defendant let a non-disabled medical writer with lower evaluation scores than plaintiff work for two years before being terminated while plaintiff—who was regarded as being disabled—was terminated in less than a year.

In addition, other medical writers who received initial evaluation scores lower than plaintiff were not terminated as quickly as was she.  Among other examples, Cafferkey received a 3.00 on one of her early evaluations but was not terminated.  *See* Doc. 29-16.  Again, many of those other employees were not directly supervised by Breen but were otherwise wholly comparable with plaintiff.  In short, construing the evidence in the light most favorable to

21

plaintiff, she was regarded as disabled and was terminated shortly after her first evaluation when other non-disabled medical writers with similar evaluation scores were allowed to keep on working until at least a second evaluation was performed.

Taking into account the evidence relied upon by plaintiff and construing it in the light most favorable to her, she has shown that there is a genuine issue of material fact as to whether defendant's proffered rational is pretextual.  Accordingly, summary judgment is improper.

### D.  Punitive Damages

Defendant asserts that it is entitled to summary judgment on plaintiff's claim for punitive damages because she has not shown that it (defendant) acted with malice or reckless indifference to plaintiff's rights.  *See, e.g., Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 529-530 (1999) ("Punitive damages are limited, however, to cases in which the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the federally protected rights of an aggrieved individual.") (quotation marks omitted).  However, as plaintiff notes in her response, "[a]n employer's conduct need not be 'egregious' to satisfy the requirements for a punitive damages award."  *Saley*, 886 F.Supp. 2d at 860.  "Rather, a plaintiff must only show that the employer discriminate[d] in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages."  *Id.* (quotation marks and citation omitted).  A plaintiff also may show that a defendant acted with reckless indifference to the rights of a plaintiff by demonstrating that "the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions."  *Hall v. Consolidated Freightways Corp. of Delaware*, 337 F.3d 669, 675 (6th Cir. 2003).

At this stage, it is plain that plaintiff and defendant's versions of her termination and the reason(s) therefore are diametrically opposed.  As has been discussed at length, if the facts are

construed in the light most favorable to plaintiff, she was performing adequately but defendant

terminated her shortly after she was exposed to HIV (and, indeed, her supervisor believed her to

be HIV positive), but expressed other reasons for the termination to plaintiff.  In addition, Breen

testified at his deposition that Tiffany Khodad (defendant's director of human resources) knew of

plaintiff's assault and was either present during the meeting when the decision to terminate

plaintiff was made or she was made aware of the decision afterwards.  Breen Depo. (doc. 22), p.

160, 193.[27] *See Saley*, 886 F.Supp. 2d at 860-61 (holding that the involvement of someone with

experience in human resources in the challenged action meant that "a reasonable juror could

conclude that Defendant acted with reckless disregard to the possibility of violating federal

prohibitions against disability discrimination.").  Moreover, "a more detailed inquiry into

Defendant's state of mind and knowledge of the ADA[] can occur at trial."  *Id.* at 861.  Given the

disparity between the parties' version of events and the Court's need to construe the evidence in

the light most favorable to plaintiff, defendant's motion for summary judgment on plaintiff's

punitive damages claim should be denied.

### E.  Back Pay

Finally, defendant asserts it is entitled to summary judgment on plaintiff's claim for back

pay because plaintiff failed to mitigate properly her damages.  Specifically, defendant argues

plaintiff "failed to mitigate damages by: 1) failing to search for <u>any</u> employment for a period of

---

[27] Defendant's argument that summary judgment is appropriate because there is no evidence of Khodad's human resources experience is without merit.  Breen testified that Khodad was the director of human resources for defendant (doc. 22, p. 160), meaning that Khodad was—or reasonably should have been—highly familiar with workplace discrimination laws.  Though Khodad's exact role in the decision to terminate plaintiff is not known with precision, it is undisputed that she was—at a minimum—made aware of defendant's exposure to HIV and termination shortly thereafter and took no action to stop plaintiff from being terminated.  .

months following her termination from Medpace; and 2) deliberately removing herself from contention for a job that was substantially similar to her Medpace job."  Doc. 24, p. 19.

"As a general rule, when a court finds discrimination it must award backpay. The special factors which would constitute exceptional circumstances and prevent backpay awards are exceedingly rare." *Thurman v. Yellow Freight Systems, Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996) (quotation marks and citation omitted).  However, "[a] plaintiff has a duty to mitigate his damages by seeking suitable employment with reasonable diligence. If an employee suffers a willful loss of earnings . . .  the employer's backpay liability is tolled." *Id.* at 1168-69 (quotation marks and citations omitted).  Generally, to toll a back pay award, a defendant is required to show that "1) there were substantially equivalent positions which were available; and 2) the claimant failed to use reasonable care and diligence in seeking such positions." *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983).  "A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation." *Id.*

Plaintiff testified that she began looking for new employment a couple of weeks after being terminated but because the criminal trial of her attacker was then coming up, she began looking in earnest only after that trial concluded.  Plaintiff Depo. (doc. 20), p. 28.  Plaintiff did withdraw from consideration from one position not long after she was terminated from defendant, but she testified that she withdrew because that job required her to travel and she could not do so because her husband had taken a job that required him to travel. *See id.* at p. 211 ("My husband had gotten an offer from his current employer, and so I actually contacted them and requested that they withdraw the application, because I would have to be traveling up and

24

back to Lafayette, which was possible, but my husband's job had approximately 25 percent travel at that point and we couldn't have both of us traveling at the same time.").  Plaintiff unambiguously testified that after her attacker's trial, she would have accepted full-time employment and had arranged for childcare.  *Id.* at 244-45.

Defendant has not shown the existence of substantially similar jobs available to plaintiff or that plaintiff failed to meet her low burden to seek employment in a reasonable manner.  In addition, given plaintiff's unambiguous testimony that she would have accepted an offer of appropriate full-time employment, the fact that plaintiff withdrew from one available job because it required travel is insufficient to grant summary judgment on plaintiff's back pay claim.  In addition, plaintiff's comments on social media that she was only cursorily looking for jobs to protect her rights to unemployment compensation stand in contrast to her testimony under oath at her deposition that she would have taken offered employment.  In short, there is a genuine issue of material fact, meaning summary judgment is inappropriate.

**III.  Conclusion**

For the foregoing reasons, **IT IS RECOMMENDED:**

Defendant's motion for summary judgment (doc. 24) should be **granted** as to plaintiff's ERISA interference claims but otherwise should be **denied**.

This 5th day of March, 2015.                        s/ J. Gregory Wehrman_____
                                                    J. Gregory Wehrman
                                                    United States Magistrate Judge

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**AT CINCINNATI**
**CIVIL ACTION NO. 13-252-SJD-JGW**

**KATHRYN ZABELL**                                                         **PLAINTIFF**

**V.**

**MEDPACE, INC.**                                                          **DEFENDANT**

**NOTICE**

Attached hereto is the Report and Recommendation of the Honorable J. Gregory Wehrman, United States Magistrate Judge.  Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within 14 days after being served with this Report and Recommendation.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).